**UNITED STATES of America,**
**Appellee,**

v.

**Felix Antonio MARTINEZ–SANTOS,**
**Defendant–Appellant.**

**Docket No. 98–1650.**

United States Court of Appeals,
Second Circuit.

Argued May 7, 1999.

Decided July 15, 1999.

Edward S. Zas, New York, NY, The Legal Aid Society, Federal Defender Division, Appeals Bureau, for Defendant–Appellant.

David Greenwald, New York, NY, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United States Attorney for the Southern District of New York, Lewis J. Liman, Assistant United States Attorney, of Counsel), for Appellee.

Before: FEINBERG, LEVAL, and MICHEL [1], Circuit Judges.

FEINBERG, Circuit Judge:

Defendant Felix Antonio Martinez–Santos ("Martinez") appeals from his sentence of 70 months imprisonment imposed by the United States District Court for the Southern District of New York, Kimba M. Wood, J., following his plea of guilty to one count of illegal re-entry into the United States after deportation, in violation of 8 U.S.C. §§ 1326(a) & (b)(2). At sentencing, the court found that Martinez had a criminal history category of V, based on a total of 12 criminal history points. On appeal, Martinez argues that the district court used the wrong standard in applying United States Sentencing Guidelines § 4A1.2(c), which excludes certain minor offenses and those "similar" to them from a defendant's criminal history. Martinez argues that under a proper reading of § 4A1.2(c) he should have been assessed only nine total points for criminal history, since three of his prior convictions are "similar" to the offenses listed in § 4A1.2(c).

---

**1.** The Honorable Paul R. Michel, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

We agree that the district court used an incorrect legal standard in determining whether Martinez's prior offenses should have been counted in his criminal history score. Therefore, we remand for resentencing consistent with this opinion.

## I. Background

Martinez, a citizen of the Dominican Republic, was admitted to the United States in 1975 as a lawful permanent resident. In 1989 he was convicted in Bronx County Supreme Court of selling a controlled substance and was sentenced to 21 months imprisonment. Because of this conviction, Martinez was deported in 1990. In August 1997 he was indicted in the Southern District for illegally re-entering the United States. In May 1998 Martinez pled guilty to this charge before Judge Wood.

The district court calculated Martinez's total offense level to be 20. Martinez does not contest this aspect of his sentence. The court then calculated his criminal history score to be 12, placing him in criminal history category V. In arriving at this score, the court included one criminal history point for Martinez's 1985 conviction for entering the subway without paying ("fare beating"), in violation of N.Y. Penal Law § 165.15(3) (McKinney 1999). The court also included two criminal history points for Martinez's two 1985 convictions for selling Transit Authority bus transfer tickets ("transfer scalping"), in violation of N.Y. General Business Law § 120 (McKinney 1988). The combination of his offense level of 20 and criminal history category V resulted in a Guideline range of 63 to 78 months imprisonment.

At sentencing Martinez argued that these three convictions should have been excluded from his criminal history score because they are "similar" to the offenses exempted from a defendant's criminal history under U.S.S.G. § 4A1.2(c). Had this argument been accepted, Martinez's criminal history score would have been nine, not 12, his criminal history category would have been IV, not V, and the applicable Guidelines range would have been 51 to 63 months, not 63 to 78. The district court rejected this argument and ruled that the offenses should each be counted because fare beating and transfer scalping "hurt society generally and hence are not completely victimless crimes." This appeal followed.

## II. Discussion

 In this court, Martinez argues that the district court erred in its analysis of his past convictions, and that under a proper reading of § 4A1.2(c), his criminal history score should be only nine points. Before turning to the merits of this claim, we note that we review a district court's interpretation and application of the Guidelines de novo, see, e.g., United States v. Zagari, 111 F.3d 307, 323 (2d Cir.1997), and its findings of fact for clear error, id. We also note that other circuits have uniformly found the classification of offenses as "similar" to the offenses listed in § 4A1.2(c) to be a matter of federal law, even though the prior offenses are defined and the sentences imposed under state law. See United States v. Rayner, 2 F.3d 286, 287 (8th Cir.1993); United States v. Kemp, 938 F.2d 1020, 1023–24 (9th Cir. 1991); United States v. Unger, 915 F.2d 759, 762–63 (1st Cir.1990). We agree, and hold that classification of unlisted offenses pursuant to § 4A1.2(c) is a matter of federal law.

### A. U.S.S.G. § 4A1.2(c)

Chapter Four, Part A of the Guidelines sets out the procedure for calculating a defendant's criminal history score. As the Introductory Commentary to the chapter explains, an assessment of criminal history is made because "[a] defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." The chapter begins with section 4A1.1, which gives an overview of the scoring system. Section 4A1.1, among other things, assigns between one and three points for each

prior conviction based on the length of the sentence imposed.

Section 4A1.2 further elaborates on the point system established by § 4A1.1. Subsection (c) of § 4A1.2 explains which prior sentences should be excluded from the criminal history score. Because the proper interpretation of this subsection is the only issue in this appeal, we quote it in its entirety:

### § 4A1.2(c). Sentences Counted and Excluded

Sentences for all felony offenses are counted. Sentences for misdemeanor and petty offenses are counted, except as follows:

(1) Sentences for the following prior offenses and *offenses similar to them, by whatever name they are known,* are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense:

Careless or reckless driving

Contempt of court

Disorderly conduct or disturbing the peace

Driving without a license or with a revoked or suspended license

False information to a police officer

Fish and game violations

Gambling

Hindering or failure to obey a police officer

Insufficient funds check

Leaving the scene of an accident

Local ordinance violations (excluding local ordinance violations that are also criminal offenses under state law)

Non-support

Prostitution

Resisting arrest

Trespassing.

(2) Sentences for the following prior offenses and *offenses similar to them, by whatever name they are known,* are never counted:

Hitchhiking

Juvenile status offenses and truancy

Loitering

Minor traffic infractions (*e.g.,* speeding)

Public intoxication

Vagrancy.

(emphasis supplied).

In other words, under the remarkably opaque language of § 4A1.2(c)(1), a prior misdemeanor or petty offense *should* be counted in calculating a defendant's criminal history score unless three conditions are met: (1) the sentence imposed was less than a term of probation of one year or a term of imprisonment of 30 days;[2] (2) the prior offense and the instant offense are not "similar;"[3] and (3) the prior offense is one of those listed in § 4A1.2(c)(1) (frequently referred to hereafter as "Listed Offenses") or is "similar" to them. Subsection 4A1.2(c)(2) is by comparison a model of clarity. It directs a court *never* to count the offenses listed there (also frequently referred to hereafter as "Listed Offenses"), or offenses "similar" to them.

In addition, the Guidelines further limit the degree to which a defendant's criminal history score can be affected by misdemeanor or petty offense convictions. Those misdemeanor-type convictions that do not qualify for exclusion under either subsection of § 4A1.2(c) are assigned only one point each, and a defendant may re-

---

**2.** The sentence on Martinez's prior conviction for fare beating was five days and the sentences for transfer scalping were each seven days. Therefore, it is undisputed that the first condition for exclusion of the prior convictions was met.

**3.** Since there is little similarity between Martinez's prior offenses and the instant offense here of illegal re-entry into the United States after deportation, it is also undisputed that this condition has been met.

ceive no more than four criminal history points of this type. U.S.S.G. § 4A1.1(c).

■ Although the Guidelines limit the degree to which relatively minor infractions affect criminal history, they in no way suggest a presumption that misdemeanors and petty offenses should be disregarded. In fact, the exception begins with the introduction: "Sentences for misdemeanor and petty offenses are counted, except as follows." § 4A1.2(c). Moreover, the defendant has the burden of showing that the exception applies. *See United States v. Booker*, 71 F.3d 685, 688 (7th Cir.1995). Overall, the Guidelines leave little doubt that the general rule is that "misdemeanor offenses are to be counted in computing a criminal history score." *United States v. Hardeman*, 933 F.2d 278, 280 (5th Cir.1991). However, they do leave doubt as to the method to use in determining when offenses are "similar" enough to the Listed Offenses to qualify for the exception.

### B. Existing Caselaw

This court has not yet explicitly addressed how district courts should determine whether a prior offense is "similar" to the Listed Offenses in § 4A1.2(c). We have previously ruled on whether specific crimes are "similar," but without articulating a standard by which to make the comparison. *See United States v. Ortega*, 94 F.3d 764, 769–70 (2d Cir.1996) (unlawful mischief not similar to any Listed Offense); *cf. United States v. Patasnik*, 89 F.3d 63, 74–75 (2d Cir.1996)(issuing a bad check under state law is same offense as Listed Offense of "insufficient funds check").

Other circuits, however, have articulated tests for making the "similarity" comparison. Not surprisingly, the inherent conflict between the Guidelines general directive that misdemeanor and petty offense crimes *should* count toward criminal history and its specific directive that the Listed Offenses, and others "similar to them," should *not* count has led to considerable variation in interpretation of § 4A1.2(c). Some courts read "similar" broadly; we refer to their interpretation as the multifactor approach. Others read "similar" narrowly; we refer to their method as the elements approach. And the approach of some courts is more difficult to characterize.

The Fifth Circuit is the creator and lead proponent of the multifactor approach. This method, initially outlined in *Hardeman*, directs the district court to take a

> common sense approach which relies on *all possible factors of similarity,* including a comparison of punishments imposed for the listed and unlisted offenses, the perceived seriousness of the offense as indicated by the level of punishment, the elements of the offense, the level of culpability involved, and the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

933 F.2d at 281 (emphasis supplied). As the Fifth Circuit explained, this method allows the district court "to screen out past conduct which is of such minor significance that it is not relevant to the goals of sentencing." *Id.* This non-exhaustive list of factors is intended to help the district court "take into account the relative severity of a prior offense as well as the degree to which it indicates the likelihood of future criminal behavior." *United States v. Gadison*, 8 F.3d 186, 193 (5th Cir.1993).

The First, Third, and Fourth Circuits subscribe to a more limited approach to the determination of similarity. These circuits endorse an interpretation of "similar" that focuses on the degree of commonality between the "elements" or "substance" of the conduct underlying the Listed Offenses and the conduct underlying potentially "similar" offenses. *See United States v. Harris*, 128 F.3d 850, 853–55 (4th Cir.1997) (crime of selling alcohol to a minor is not similar to the Listed Offenses because the crime does not "share common elements with any of the listed offenses"); *United States v. Elmore*, 108 F.3d 23, 26–

27 (3d Cir.1997) (rejecting defendant's argument that his prior convictions for harassment, assault and possession of drug paraphernalia are similar to the Listed Offense of disorderly conduct); *Unger*, 915 F.2d at 762–63 (court should look to the "conduct underlying defendant's three juvenile adjudications" to determine whether they were status offenses such as those listed under § 4A1.2(c)(2)).

Of the remaining circuits, the Ninth has articulated the applicable test in two different ways. *See United States v. Sandoval*, 152 F.3d 1190, 1192 (9th Cir.1998). The first was adopted in *United States v. Martinez (Clyde)*, 905 F.2d 251 (9th Cir. 1990). There, the court analyzed the offenses listed in § 4A1.2(c)(2) and concluded that they "are excluded ... because they are of such minor significance to the goals of sentencing that inclusion would more likely distort than improve the [sentencing] process." *Martinez (Clyde)*, 905 F.2d at 253 (citation omitted). The court found that the Listed Offenses as a group "offer no basis for predicting future significant criminal activity by the defendant; the conduct they involve is not uniformly criminalized, and when it is, the penalty is usually light." *Id.* (footnote omitted). Therefore, the court held, similarity should be determined by analyzing unlisted offenses to assess the degree to which they shared the general characteristics found among Listed Offenses. The court concluded that defendant's prior conviction for public indecency was not "similar" to the Listed Offenses because it is "universally regarded as culpable" and is relevant for assessing the potential for future criminal conduct. *Id.* at 254.

Judge Wallace concurred in *Martinez (Clyde)*, but objected to the test adopted by the court. He suggested instead that the inquiry should "focus on whether the activity underlying an offender's prior offense is similar to the activity underlying" the Listed Offenses, 905 F.2d at 255, and concluded that public indecency is not similar to the (c)(2) Listed Offenses because one of the elements of public indecency, sexual conduct, is not an element of any of the Listed Offenses. *Id.* at 255–57. A Ninth Circuit panel adopted Judge Wallace's approach in *United States v. Martinez (Carlos)*, 69 F.3d 999, 1000 (9th Cir. 1995), holding that "[t]he inquiry into whether [an unlisted offense] is 'similar' to a section 4A1.2(c)(2) listed offense must focus on whether the activity underlying [the unlisted offense] is similar to the activities underlying the listed offenses." *Id.* However, the *Martinez (Carlos)* panel adopted the new test without abandoning the original test.[4] Thus in *Sandoval*, 152 F.3d at 1192, the court simply noted that the Circuit has taken two different approaches to determining similarity and concluded that defendant's prior conviction was not "similar" to the Listed Offenses under either.

In the Seventh Circuit, an early interpretation of § 4A1.2(c) by Judge Posner succinctly summarized the goal of the similarity inquiry—to determine whether an unlisted offense was "categorically more serious" than the Listed Offenses. *United States v. Caputo*, 978 F.2d 972, 977 (7th Cir.1992) (using a false driver's license is "categorically more serious" than, and therefore, not similar to, driving without a license or giving false information to a police officer). In a later case, the court noted that the *Hardeman* factors were a "helpful device" for making the comparison described in *Caputo*. *Booker*, 71 F.3d at 689. However, the Seventh Circuit has stated in two recent opinions that it has

---

4. The panel briefly discussed the *Martinez (Clyde)* analysis, calling it a "three factor test," and restating it as:

 (1) whether society has an interest in punishing the conduct involved and discouraging its repetition; (2) whether the conduct involved in the prior offense is uniformly criminalized, and if so, whether the penalty is light; and (3) whether the prior offense offers a basis for predicting future significant criminal activity by he defendant.

 *Martinez (Carlos)*, 69 F.3d at 1001. However, the panel found that this test was not applicable to the particular facts before it. *Id.*

not adopted a "formal analysis" for determining the similarity of offenses under § 4A1.2(c). *See United States v. Boyd*, 146 F.3d 499, 501 (7th Cir.1998) and *United States v. Binford*, 108 F.3d 723, 726 (7th Cir.1997) (prior decisions of the circuit do not "mandat[e] any type of formal analysis")(citing *Booker*, 71 F.3d 685, and *Caputo*, 978 F.2d 972). Yet, although in theory the Seventh Circuit has not formally adopted a particular test, in practice it allows use of the multifactor test, since it has not limited the inquiry only to the elements approach. *See Boyd*, 146 F.3d at 501–02 (considering whether unlisted offense involves "an element of indifference to society," the purpose of the law and the location of the offense in the statutory code).

The Tenth and Eleventh Circuits have applied § 4A1.2(c) without formally articulating a test, *see, e.g. United States v. Horton*, 158 F.3d 1227 (11th Cir.1998); *United States v. Norman*, 129 F.3d 1393 (10th Cir.1997); *United States v. Cox*, 934 F.2d 1114 (10th Cir.1991); *United States v. Wilson*, 927 F.2d 1188 (11th Cir.1991) and without explicitly commenting on the tests used by other circuits. And the Eighth Circuit, in *United States v. Mitchell*, 941 F.2d 690, 691 (8th Cir.1991), held that "similar" is to be given its "normal" or dictionary meaning. However, it too did not comment on the tests described above.

### C. Arguments of the Parties

Martinez urges us to adopt a multifactor analysis, and claims that under that approach his earlier fare beating and transfer scalping convictions should not be counted in his criminal history score because they are similar to the Listed Offenses. In response, the government asks us to use the elements test, which it says required the district court to count (as it did) Martinez's prior offenses because they are not similar to the Listed Offenses.

Martinez primarily argues that the Sentencing Commission did not intend courts to focus on conduct and elements alone in identifying which prior offenses should be excluded from a defendant's criminal history score. Martinez points out—indeed, the government agrees—that the Listed Offenses share few common attributes. This, he says, suggests that (c)(1) and (c)(2) should be read as non-exhaustive, illustrative lists of crimes. Thus, he contends that § 4A1.2(c) directs the district court to identify offenses that, like those listed in (c)(1) and (c)(2), are of such minor seriousness that they offer no insight into future criminal conduct.

Martinez also argues that the elements approach would undermine sentencing uniformity, which is a central goal of the Guidelines. *See United States v. Chabot*, 70 F.3d 259, 260 (2d Cir.1995)(per curiam). Thus, Martinez suggests that the elements approach could result in (1) inclusion in a defendant's criminal history score of minor offenses that offer no predictive value as to future criminal conduct, but which contain elements that do not neatly match with the Listed Offenses, while (2) allowing exclusion of prior convictions for more serious crimes that include elements easily matched with the elements of the Listed Offenses. Alternatively, defendants with similar overall histories of minor criminal behavior might be subject to significantly different sentencing ranges because of the fortuitous correlation of elements of some prior crimes with the Listed Offenses.

Finally, Martinez argues that the elements approach uses an interpretation of "similar" that violates basic rules of statutory construction. Martinez points out that subsections 4A1.2(c)(1) & (2) each exclude their Listed Offenses and "offenses similar to them, by whatever name they are known." Martinez suggests that reading "similar" to include only offenses that share common elements with the Listed Offenses would render the phrase "offenses similar to them" mere surplusage. Further, he points out that the Commission could easily have drafted language limiting "similar" to the elements approach definition, had it chosen to do so. For

example, the Commission could have limited exclusion to the "listed offenses, by whatever name they are known," or to "offenses having the same (or similar) elements." Since the drafters did not use such precise, easily available language, Martinez argues that "similar" must be read to encompass some group of offenses that have different elements than the Listed Offenses, but are comparably minor in overall seriousness.

The government initially defends the elements test by disputing the theory that the lists in (c)(1) and (c)(2) are meant to be illustrative. It points out that the Guidelines contain other lists, and that such lists are preceded by the word "include" when the Commission wanted to indicate that a list was "merely illustrative." *See, e.g.,* U.S.S.G. §§ 2F1.1, comment. (n.1) (list of financial institutions); 2K1.3, App. Note 1 (list of explosive materials); 4B1.2, comment. (n.1)(list of crimes of violence).

Further, in response to Martinez's argument that the Commission's decision not to use more restrictive language supports a multifactor approach to "similar," the government argues that the Commission's decision not to use broader language supports an elements approach. It claims that if the Commission intended to state a general principle about excluding crimes of low overall seriousness, it could have done so explicitly. Instead, the Commission compiled a lengthy list of crimes that share few characteristics. This, the government says, suggests that the Commission intended that only these crimes, and ones almost identical, should be excluded from a defendant's criminal history. The government even proposes that the phrase "by whatever name they are known" could be read to limit "similar" only to Listed Offenses with different names due to variation in state petty crime nomenclature. In other words, "offenses similar to them, by whatever name they are known" could be read as narrowly as "the same offenses by any other name."

The government also argues that reading "similar" as "similar elements or conduct" will better achieve the general Guidelines goal of avoiding sentencing disparities among similarly situated defendants. It claims that because the elements test takes only two factors into consideration—statutory elements of the listed and unlisted offenses and the defendant's actual conduct—it is more likely to produce the same results when applied by different judges. Therefore, defendants with similar petty crime backgrounds will be more likely to receive similar guideline ranges and similar sentences.

In addition to defending the elements approach, the government offers a number of arguments against adoption of the multifactor approach. First, it contends that the multifactor test "is in tension with the structure" of the Guidelines. The government points to § 4A1.2(c)(1)(A), which limits exclusion of prior offenses to those crimes where defendant's sentence was less than 30 days imprisonment or one year probation. It then notes that the multifactor test allows the sentencing court to consider the maximum statutory sentence and the actual sentence for listed and unlisted offenses. The argument apparently is that use of the multifactor test effectively "rewrites" the limitation in § 4A1.2(c)(1)(A) and also wrongly injects prior offense sentence length into § 4A1.2(c)(2), which in instructing the court "never" to count the Listed Offenses and offenses similar to them implicitly disregards prior sentence length. Therefore, since the multifactor test includes sentence length, and the Commission directed the district court to consider sentence length only for (c)(1) offenses, then the Commission did not intend "similar" to be interpreted under a multifactor test.

The government also contends that, in contrast to the elements test, the multifactor test is much more difficult to apply and would "reintroduce the very indeterminacy and arbitrariness that the Guidelines system was designed to eliminate." Finally,

the government argues that reading "similar" narrowly under an elements test is really of no great import, as the district court may depart downward under U.S.S.G. § 4A1.3 if inclusion of prior misdemeanors over-represents a defendant's criminal history or recidivist tendencies.

D. Test to be applied

▪ In a search for guidance in light of these numerous volleys back and forth regarding the meaning of "similar," we turn first to some fundamental concepts. We use basic statutory construction rules when interpreting the Guidelines. *See United States v. Lewis*, 93 F.3d 1075, 1080 (2d Cir.1996). The Supreme Court has observed, in "cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (internal quotations and citations omitted). So, " 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' " *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir.1992) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). Therefore, our first step in interpreting § 4A1.2(c) must be to determine the ordinary or common meaning of "similar."

According to Webster's Dictionary, "similar" is defined as "having characteristics in common; very much alike; comparable." Webster's Third New International Dictionary 2120 (Philip Babcock Gove, ed., 1981). The government itself states that the plain meaning of "similar" is " 'nearly corresponding; resembling in *many respects.*' " (quoting *Harris*, 128 F.3d at 854)(emphasis supplied). Given these definitions, we find that the broader interpretation of "similar" used in the multifactor test imparts to "similar" its regular or ordinary meaning better than the limited interpretation used in the elements

approach. While this alone seems very persuasive to us, we think that some of the arguments referred to above deserve further analysis.

First, as to the alternative language theories propounded by Martinez and the government, the arguments above demonstrate that each can imagine language that, had it been used, would have better communicated the Commission's intent to define "similar" more narrowly or more expansively. However, since each points to language that would discredit the other's theory, if only the section were so written, we find these arguments ultimately not dispositive here.

On the other hand, we do find Martinez's statutory construction argument helpful. We agree, that at a minimum, we should read the language "offenses similar to them" to include some offenses beyond the Listed Offenses. To do otherwise would violate a basic rule of statutory interpretation: avoid reading statutory language in a way that would "in any way make some of its provisions surplusage." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985). Therefore, we reject the government's suggestion that we read § 4A1.2(c) as an attempt merely to circumvent variations in state petty crime nomenclature.

Moreover, we are not persuaded by the government's argument that the multifactor test "is in tension with the structure" of the Guidelines. While actual sentence imposed is a threshold condition for exclusion of prior offenses under § 4A1.2(c)(1), but not under § 4A1.2(c)(2), this does not mean that consideration of prior sentence length in assessing similarity is expressly foreclosed under (c)(2). Nor does it mean that maximum sentence length may not be considered by a district court at a later stage in the similarity inquiry under either (c)(1) or (c)(2). Instead, we view the inclusion of sentence length as a condition for exclusion under § 4A1.2(c)(1) as an indication that the Sentencing Commission found sentence length particularly useful in de-

ciding whether a prior offense should be counted in a defendant's criminal history. But most importantly, we think the government misconstrues the purpose of looking to the sentence under the multifactor approach. Consideration of sentence length simply offers a court another variable by which to assess the overall seriousness of the unlisted offense. It is not meant to limit the inquiry to only a comparison of past punishments. *See Harris,* 128 F.3d at 854.

■ As for the Guidelines goal of sentencing certainty, the government may be correct that a narrow reading of "similar" would lead to the most predictable results. However, the Guidelines are not solely concerned with certainty. They also seek fairness. By using an indeterminate word like "similar," the Commission signaled its intent to sacrifice some certainty for a commensurate amount of flexibility and resulting fairness. Interpreting "similar" more broadly reduces the likelihood that defendants will suffer excessively heavy increases of sentence under the criminal history axis because of relatively trivial misconduct. Further, we feel confident that granting to the district courts this additional flexibility generally will not result in wildly varied sentences. And in those rare cases where the district court veers off course, the similarity inquiry raises an issue of law. As such, we review de novo the district court's decision to include or exclude a prior offense under § 4A1.2(c).

We reject the government's argument that this issue does not really matter, since only four criminal history points are in play and the court can always depart downward under § 4A1.3. First, four points can in some circumstances greatly increase a defendant's sentence range,[5] and even one extra month in jail is signifi-

cant from a defendant's point of view. As to the departure argument, we point out that the reverse is also true. That is, if the multifactor interpretation of "similar" leads a district court to exclude prior petty offenses so that a defendant's criminal history is under-represented, the court may depart upward pursuant to the same section. More importantly, as Martinez points out, departure decisions are highly discretionary and in some instances not reviewable on appeal. We prefer to give district courts greater leeway to make the comparison as a matter of law than to restrict the scope of their inquiry and force them to resort to discretionary departures to set an appropriate sentencing range.

Finally, we emphasize that we do not think that the elements approach is wrong. It is simply too rigid. The statutory elements of the listed and unlisted offenses and the actual conduct engaged in by a defendant may often prove determinative for a district court in its similarity analysis. However, while these two factors may be the most important in some cases, in others the comparison might be aided by consideration of other factors embraced by the multifactor approach. To foreclose a district court from also evaluating the "punishments imposed for the listed and unlisted offenses, the perceived seriousness of the offense as indicated by the level of punishment, . . . the level of culpability involved, and the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct" in cases where these factors might be helpful limits unnecessarily the scope of the district court's inquiry. (quote from *Hardeman,* 933 F.2d at 281).

In sum, this case is a good example of the growing complexity of the Guidelines and the difficulties in interpreting them.[6]

---

5. For example, a drug defendant who is at level 30 because of the drug quantity and has three criminal history points plus four prior convictions for petty crimes would realize an increase of his maximum range of 33 months if the prior petty offenses are counted.

6. Indeed, further linguistic arguments are possible. For example, we note that the word "similar" appears twice in § 4A1.2(c)(1). The first usage is the one that concerns us in this opinion. But "similar" is used again in 4A1.2(c)(1)(B) to require counting the prior

Although we endorse a multifactor interpretation of "similar," we see no need to adopt the *Hardeman* multifactor test verbatim. · Instead, we direct the district court to read "similar" to encompass the factors listed in *Hardeman* as well as any other factor the court reasonably finds relevant in comparing prior offenses and Listed Offenses. Overall, the court should keep in mind that the goal of the inquiry is to determine whether the unlisted offense under scrutiny is "categorically more serious" than the Listed Offenses to which it is being compared. *Caputo*, 978 F.2d at 977.

### E. Application

■ At sentencing, the district judge apparently relied on only one factor in arriving at the conclusion that Martinez's prior convictions were not similar to the Listed Offenses. The judge mentioned only that both fare beating and transfer scalping were not "victimless" when she held that the prior convictions should result in the assignment of criminal history points.

This rationale for counting the three prior convictions here is not supportable.[7] As already indicated, we believe that reliance upon one criterion alone—here, "victimlessness"—is not the best way to distinguish between listed and unlisted crimes: Several of the Listed Offenses—insufficient funds check, non-support, and trespassing—are not victimless. Clearly, the Guidelines did not intend to limit similar offenses to victimless activities.

Both Martinez and the government raise various other arguments as to why the prior crimes of fare beating and transfer scalping are or are not similar to the Listed Offenses. We leave these arguments to be pressed before the district court in the first instance, in light of the standard articulated above.

### Conclusion

For the reasons set forth above, we adopt a multifactor approach for interpretation of "similar" in comparing prior offenses to the Listed Offenses in U.S.S.G. § 4A1.2(c). We vacate defendant's sentence and remand to the district court for resentencing consistent with this opinion.

offense in criminal history "if it was similar to an instant offense." It is arguable that the second use of "similar" does not intend as broad a scope of similarity as the earlier use, so that our interpretation results in the word being used twice in the same statute with different meanings. For a number of reasons, we think it neither necessary nor fruitful to consider this possible argument further. First, neither party has raised it. Second, it is not clear to us that the multifactor test should not be used in determining similarity of prior offenses to the instant offense under (c)(1)(B). Finally, and most significantly, our approach is to give the word "similar" its most natural meaning unless that meaning is

precluded by the context. Even if the context of the second usage in (c)(1) suggests that a narrow meaning was intended, the broader meaning still seems more natural in the context of the first usage in (c)(1). This is not a circumstance, furthermore, which compels the conclusion that the drafters intended that both usages must have the same meaning; it may simply be an instance of the use of a single adjective in slightly different ways in two segments of a complex rule.

7. In fact, the government does not defend the district judge's analysis to us.